IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| JENS RICHTER, an individual d/b/a GLOBAL EQUINE SIRES and A-1 PERFORMANCE SIRES, | ) ) ) ) | No. 36822-0-III |
| Appellant, | ) ) | |
| v. | ) ) | UNPUBLISHED OPINION |
| ALLIE HELINSKI an individual and BRENT HELINSKI, an individual and as husband and wife, and the marital community thereof, | ) ) ) ) ) ) | |
| Respondents. | ) | |

FEARING, J. — We affirm the trial court's vacation of default orders and a default judgment entered against defendants Allie and Brent Helinski. The trial did not abuse its discretion when applying equity to vacate the orders and judgment.

FACTS

Jens Richter owns and operates Global Equine Sires (Global), which sells horse semen. Allie Helinski formerly owned A-1 Performance Sires (A-1), which also sold horse semen.

On June 3, 2016, Jens Richter purchased "the Business A-1 Performance Sires" from Allie Helinski for $7,000 cash and $7,000 in semen. A one page contract listed the

assets sold as cryo-storage tanks, shipping containers, customer lists, business license, website, media, and financial records. Paragraph 3 of the sales contract declared:

> Not included is current A-1 Performance Sire Semen inventory. A list that has been signed by both parties will be attached to that contract.

Clerk's Papers (CP) at 55. Under the sale agreement, Allie Helinski promised to work for A-1 after the sale. Her duties would include sales for A-1, expanding Jens Richter's business, and packing and shipping product of Global and A-1.

Cryo-storage tanks and shipping containers of A-1 sold to Jens Richter remained in the possession of Allie Helinski so that she could ship semen to customers of Jens Richter. Allie Helinski kept in her possession semen, over which she retained ownership, and semen owned by Jens Richter under the business names of Global and A-1. Richter owned horse semen valued at $295,550 in a container in Allie's possession. After the sale of A-1 to Richter, Helinski sold both her product and Richter's product.

On April 28, 2018, Jens Richter traveled from his residence in California to Otis Orchards to retrieve A-1's five cryo-storage tanks, shipping containers, and stock of horse semen. Two of the shipping containers failed. The failure resulted in loss of a significant amount of semen, causing anger in Richter. An old cryo-storage tank also failed. Allie Helinski insists that the containers and the tank failed not because of any fault on her behalf.

2

For some unknown reason, Allie Helinski did not inform Jens Richter, on his arrival in Washington State, of the failure of the cryo-storage tank. While Richter remained in Washington State, the two divided their respective inventories of semen. Richter left one pile of semen for Helinski to sell on his behalf. Helinski insists that she packaged and shipped the final inventory of semen Richter left with her. Helinski ended her work for Richter on May 29, 2018.

Jens Richter later requested that Allie Helinski forward the semen straws from the failed cryo-storage tank. The seller of horse semen delivers the product in semen straws. Richter claims Helinski denied her request. Helinski admits that she never sent to Richter the semen from the failed tank, but rejects any obligation to have forwarded the semen to Richter because of its lack of viability.

According to Jens Richter, he received concerns from customers regarding semen straw deliveries. Customers of A-1 complained to Richter that they received ineffective semen or empty semen straws. Richter concluded that Allie used the A-1's business to rid herself of empty semen straws, ineffective straws, or no straws and to pocket the profits. In Richter's declaration in support of default judgment, he testified:

> I have compiled receipts from the customers who contacted me. The receipts are attached as Exhibit B. I have personal knowledge that the following list of customers paid Allie Helinski.

CP at 49. Richter attached a typed list of seven semen straws that included dates of sale and sales totaling $24,650. Richter also attached five invoices for seven of the straws.

3

On August 29, 2018, Jens Richter filed a summons and complaint against Allie

Helinski and her husband, Brent.  Richter sued Helinski for breach of contract, tortious

interference with a business expectancy, fraud, conversion, unjust enrichment, and

violation of the Consumer Protection Act, chapter 19.86 RCW, stemming from Helinski's

alleged unauthorized selling of semen straws to A-1 costumers.  Richter alleged that

Helinski had received payments and taken orders on behalf of A-1, but never fulfilled the

orders.  Richter also alleged that Helinski made unauthorized sales of product, knowingly

sold defective product, and sold product that misprinted the name of the stallion donor.

In addition to seeking damages, the complaint requested an injunction.  On August 31,

2018, Allie was served the summons and complaint.

On September 15, 2018, Allie Helinski met with attorney Robert Sargent and paid

a $1,500 retainer for Sargent to represent her.  Helinski delivered Sargent a copy of the

summons and complaint.

On September 18, 2018, Allie Helinski received a letter from Jens Richter's

counsel, Chad Freebourn, requesting the return of the semen purportedly stored in the

tank remaining in Helinski's possession.  Helinski notified Sargent of the letter, and he

told her that he had contacted Richter's attorney and would handle the matter.

In a declaration, Robert Sargent states:

> Shortly after my retention, I called Plaintiff's counsel, Roberts
> Freebourn, PLLC, to discuss the Helinski case.  I called multiple times.
> Each time I called, I left a voice message identifying myself and the case

4

and requesting a call back in order [to] discuss the matter. I did not receive any calls back.

After not receiving any return calls, I went in person to Roberts Freebourn, PLLC, at 1325 W. 1st Ave., Ste. 303 in Spokane, Washington. I went [to] the Roberts Freebourn office twice to speak with an attorney about the Helinski matter. Each time I went in person to the law firm, I was met by a secretary, Lauren, who took my business card and the reason for my visit.

CP at 152.

As of September 24, 2018, Robert Sargent had yet to speak with Chad Freebourn. On that date, Jens Richter obtained an order of default judgment against Allie Helinski. On September 26, 2018, Brent Helinski was served the summons and complaint.

According to Chad Freebourn, he received a voicemail message from Robert Sargent, on October 5, 2018, reporting his representation of Allie Helinski. Freebourn never returned Sargent's call. On October 17, 2018, Jens Richter obtained an order of default against Brent Helinski. Between October 22 and October 25, according to Freebourn, Sargent arrived at his office and left his business card with Freebourn's assistant, but Freebourn was unavailable to speak with him.

On October 26, 2018, Victoria Johnston, an attorney at Roberts | Freebourn, PLLC telephoned Robert Sargent. The attorneys discussed the lawsuit claims, potential settlement, and the status of semen inventory. Johnston did not mention the earlier orders of default.

On October 30, 2018, Victoria Johnston sent an e-mail to Robert Sargent:

5

>       We talked at the end of last week about Allie turning over any and
> all remaining semen that she has that belongs to our client Jens Richter aka
> Global Equine.  You indicated that Allie said that all of the inventory was
> spoiled because of a power outage but at the very least she could give us
> the spoiled inventory.  You were checking to see if there was any viable
> inventory left.  You also mentioned that you might have a settlement offer.
> I have not heard anything back from you.  Please advise as to what you
> found out and please clarify who you represent in this matter.

CP at 156.  Robert Sargent replied to the e-mail that same day and wrote that he would

respond to Johnston by the following morning.  The record does not show that Sargent

responded.

On January 23, 2019, Jens Richter filed a motion for entry of default judgment

against Allie and Brent Helinski.  On February 22, the superior court conducted a

reasonableness hearing to establish the amount of damages to be awarded Richter against

the Helinskis.  The court awarded damages of $373,891 and entered judgment against

Allie and Brent Helinski for the amount.  Neither the Helinskis, nor their counsel,

received notice of the hearing.

On March 9, 2019, Brent Helinski noticed his bank account drained of all funds.

His bank informed him of a garnishment.

On March 9, Allie Helinski discovered an envelope containing a copy of the

default orders, the default judgment, a notice and writ of garnishment, and an exemption

claim form.  Helinski immediately contacted Robert Sargent about the paperwork and the

emptied bank account.  Sargent told Allie Helinski that he would go to Roberts |

6

Freebourn the following Monday morning, March 10, 2019, and get the judgment overturned. On March 10, Allie Helinski received no phone call, and so she called Sargent. Sargent told her that he does not handle her type of case, that she needed to hire a different attorney, and he would refund the retainer.

Allie Helinski met with attorneys at the law office of Paukert & Troppmann, PLLC on March 12, 2019. During the consultation, Helinski retained the firm to represent them in this suit.

## PROCEDURE

Allie and Brent Helinski filed a motion to vacate the two default orders and the judgment. The Helinskis argued that they were entitled to notice of the default proceedings because Robert Sargent substantially complied with the notice of appearance requirements. According to the Helinskis, because they lacked notice, the court should vacate the orders and judgment. The Helinskis also argued that, assuming Sargent made no appearance, the default orders and judgment should be vacated under subsections (1), (4), and (11) of CR 60(b).

In an oral ruling, the trial court concluded that no dispute existed as to whether Allie Helinski contacted Robert Sargent on September 15, yet Sargent had never entered a notice of appearance. Otherwise, factual disputes of other events, such as when Robert Sargent attempted to contact Chad Freebourn, existed. Regardless, the trial court

7

concluded that Robert Sargent did not substantially comply with notice of appearance

requirements before entry of the default orders and default judgment.

Because the parties on appeal dispute the substance of other rulings by the trial

court, we quote portions of the oral ruling:

> And that is really where I come back to, applying the *White* factors, because I don't know that I have sufficient facts to say that there was substantial compliance prior to those defaults being taken.
> . . . .
> I'm winding around to my review of the *White* factors, and obviously the parties are clearly opposed diametrically with regards to interpretation of those factors, whether there is a defense being made. The information outlined by Ms. Allie Helinski is there was no semen to return, it was all dead. . . .
> . . . .
> The declaration provided by Allie Helinski states the semen wasn't converted, it was not viable, and why those things weren't addressed when the plaintiff was here in Spokane, I don't know. That's not addressed with the declaration. So is there at least a prima facie defense to the issues, at least, as it appears to this Court, there is.
> Then evidence of mistake, inadvertence, surprise, and excusable neglect, that also gives me a bit of a pause because Mr. Sargent is the Helinskis. They've done what they need to. He— by "he" I mean Mr. Sargent—did not. Mr. Sargent is the one responsible for filing the notice of appearance, frankly, as soon as practical, at least in my experience. . . .
> But that factor addresses whether there is one of those bases to move forward and overset the default under these circumstances. I analyze that by looking at this case from the perspective of coming back to the purpose of and the overall liberal application of setting aside defaults, and the purpose that really is to go to resolution of cases on their merits versus defaults.
> The last two factors in *White* really are due diligence. I don't think there's any issue with regards to due diligence and prejudice as it is outlined. What is argued by the plaintiffs is this matter is resolved and we don't want to deal with it again. That is not sufficient for a substantial prejudice basis.

So as I analyze this, I don't come to the conclusion that is argued by the defendant that Mr. Sargent substantially complied by the time the defaults are taken. There are no facts that establish that, at least for Allie Helinski. It's possible substantial compliance applies for Brent Helinski, based upon the message left, based upon cards, based upon visits. Those facts make my determination a little bit more difficult. Taking all of the facts into consideration regarding the factors, I am going to grant the request to set aside the default under this set of circumstances.

. . . Again, I want to make sure the record is very clear that I have contemplated the facts in this case, as well as the law that has been provided by counsel, to reach my decision to grant the motion to vacate the two defaults, as well as the default judgment.

Report of Proceedings at 23-26. The trial court entered an an order vacating the two default orders and the default judgment.

## LAW AND ANALYSIS

Jens Richter appeals the orders vacating the two default orders and the default judgment. The orders of vacation are not final orders in the sense of terminating litigation below. Instead the orders opened the case to further litigation. Nevertheless, under RAP 2.2(a)(10), a party may appeal from an order granting or denying a motion to vacate a judgment.

Although Jens Richter frames his assignments of error in terms that the trial court erred in vacating the judgment against both Allie and Brent Helinski, Richter, in his argument, focuses only on the default order and default judgment against Allie. Richter never discusses the disparate facts concerning the service on Brent Helinski and the fact that Robert Sargent contacted Richter's counsel and announced his representation of the

Helinskis before entry of the default order against Brent. For this reason alone, we affirm the vacation of the default order and judgment against Brent Helinski. The analysis we perform concerning the vacations in favor of Allie Helinski would also apply to Brent, however.

Jens Richter asserts that the trial court committed two errors when vacating the default orders and default judgment. First, the trial court erred when ruling that Allie Helinski showed a prima facie defense to the complaint. Second, the trial court failed to make a finding that Allie Helinski's failure to timely appear and answer the complaint was due to mistake, inadvertence, surprise, or excusable neglect in conformance with CR 60(b)(1).

On appeal, Allie Helinski does not expressly argue that Robert Sargent entered a notice of appearance before the entry of either order of default or the default judgment. Nor does she present any analysis that Sargent made an appearance by contact with Jens Richter's counsel. So we do not address whether Jens Richter needed to give advance notice to Helinski or her counsel of the entry of the defaults.

In their respective briefing, neither party distinguishes between vacating an order of default and a default judgment. Instead, both conflate the rules that apply to each. CR 55 controls vacating a default order, and CR 60 controls vacating a default judgment. Different rules apply. *Sellers v. Longview Orthopedic Associates, PLLC*, 11 Wn. App. 2d 515, 519, 455 P.3d 166 (2019) *review denied*, No. 98120-5 (Wash. Apr. 29, 2020); *Seek*

*Systems, Inc. v. Lincoln Moving/Global Van Lines, Inc.*, 63 Wn. App. 266, 271, 818 P.2d

618 (1991). In another case, the difference in rules between vacating a default order and

vacating a default judgment might control the outcome. This is not the case in Jens

Richter's appeal.

Vacation of Default Judgment

CR 60(b) addresses vacation of a default judgment. Allie Helinski relies on three

subsections of CR 60(b). We quote the opening sentence of CR 60(b) and the relevant

subsections:

> Mistakes; Inadvertence; Excusable Neglect; Newly Discovered
> Evidence; Fraud; etc. On motion and upon such terms as are just, the court
> may relieve a party or the party's legal representative from a final
> judgment, order, or proceeding for the following reasons:
> (1) Mistakes, inadvertence, surprise, excusable neglect or
> irregularity in obtaining a judgment or order;
> . . . .
> (4) Fraud (whether heretofore denominated intrinsic or extrinsic),
> misrepresentation, or other misconduct of an adverse party;
> . . . .
> (11) Any other reason justifying relief from the operation of the
> judgment.

(Boldface omitted.) The trial court relied on subsection (1), and so do we.

We review a trial court's decision to vacate a default judgment for abuse of

discretion. *Morin v. Burris*, 160 Wn.2d 745, 753, 161 P.3d 956 (2007). The trial court

abuses its discretion only when it bases its order on untenable grounds or untenable

reasons. *Morin v. Burris*, 160 Wn.2d at 753.

11

Two important polices behind America's civil justice system clash in the context of a motion to vacate a default judgment. On the one hand, we prefer that courts resolve disputes on the merits. *Akhavuz v. Moody*, 178 Wn. App. 526, 532, 315 P.3d 572 (2013). On the other hand, we value an organized, responsive, and responsible judicial system wherein litigants acknowledge the jurisdiction of the court to decide cases and litigants comply with rules. *Little v. King*, 160 Wn.2d 696, 703, 161 P.3d 345 (2007). When balancing these competing interests, the overriding concern is to execute justice. *Griggs v. Averbeck Realty, Inc.*, 92 Wn.2d 576, 582, 599 P.2d 1289 (1979); *DeCaro v. Spokane County*, 198 Wn. App. 638, 643, 394 P.3d 1042 (2017). Because of the strong policy of resolving disputes on the merits, Washington law disfavors default judgments. *Little v. King*, 160 Wn.2d at 703. The trial court should exercise its authority to vacate a judgment liberally. *Morin v. Burris*, 160 Wn.2d at 754 (2007); *Ha v. Signal Electric, Inc.*, 182 Wn. App. 436, 449, 332 P.3d 991 (2014).

Since 1968, Washington courts, when addressing a motion to vacate under CR 60(b)(1), have followed a four-part test found in *White v. Holm*, 73 Wn.2d 348, 352 (1968):

> These factors are: (1) that there is substantial evidence extant to support, at least prima facie, a defense to the claim asserted by the opposing party; (2) that the moving party's failure to timely appear in the action, and answer the opponent's claim, was occasioned by mistake, inadvertence, surprise or excusable neglect; (3) that the moving party acted with due diligence after notice of entry of the default judgment; and (4) that no substantial hardship will result to the opposing party.

12

On the one hand, the *White v. Holm* test prevents those who purposely do not contest a default or do not timely do so from benefitting from their actions. *DeCaro v. Spokane County*, 198 Wn. App. 638, 645 (2017). On the other hand, the rule allows second chances for those who promptly assert their interest and show an ability to successfully contest the case. *DeCaro v. Spokane County*, 198 Wn. App. 638, 645 (2017).

Defense of Allie Helinski

The first step in the *White v. Holm* factors directs the court to consider whether the moving defendant possesses a prima facie defense to the plaintiff's claim. If the movant lacks a prima facie defense, the court will automatically deny the motion. *Griggs v. Averbeck Realty, Inc.*, 92 Wn.2d 576, 583 (1979); *DeCaro v. Spokane County*, 198 Wn. App. 638, 645 (2017). If the defendant shows a prima facie defense, the court engages in a review of the defaulted defendant's reason for failing to timely appear in the action. *White v. Holm*, 73 Wn.2d 348, 353-54 (1968); *Akhavuz v. Moody*, 178 Wn. App. 526, 534 (2013).

In determining whether evidence supports a prima facie defense, the trial court must take the evidence, and the reasonable inferences therefrom, in the light most favorable to the movant. *TMT Bear Creek Shopping Ctr., Inc. v. Petco Animal Supplies, Inc.*, 140 Wn. App. 191, 202, 165 P.3d 1271 (2007). In other words, the defendant

satisfies its burden of demonstrating the existence of a prima facie defense if it produces evidence which, if later believed by the trier of fact, would constitute a defense to the claims presented. *TMT Bear Creek Shopping Ctr., Inc. v. Petco Animal Supplies, Inc.*, 140 Wn. App. at 202. To establish a prima facie defense, affidavits supporting motions to vacate default judgments must set out the facts constituting a defense and cannot merely state allegations and conclusions. *Ha v. Signal Electric, Inc.*, 182 Wn. App. at 449 (2014).

Jens Richter argues that Allie and Brent Helinski fail to present substantial evidence to show a prima facie defense to his claims. Richter argues that the only evidence of a defense put forward by the Helinskis, the declaration of Allie, presents only self-serving statements which are insufficient to support a defense. The Helinskis respond that they have put forth evidence of a sufficient defense to liability, causation, and damages. We conclude that Helinski presented a prima facie defense for all factual allegations that comprise the various causes of action asserted by Jens Richter.

We assume that, since the movant cannot rest on mere allegations and speculation in presenting her defense, the non-moving party must also present admissible underlying facts in support of his claims. Jens Richter's declaration in support of his motion for default is weak on details. He testified to two categories of fault on the part of Allie Helinski and damage to him: (1) Helinski's converting the semen in the cryo-storage tank; and (2) Helinski's selling defective product to customers and pocketing the money.

14

He asserted without any supporting inventory that the semen in the tank was worth $295,550.

In his declaration, Jens Richter provided no statements from any customers who complained of product delivered or the details of the complaints. He attached to his declaration receipts from customers, but he did not expressly testify that he did not receive the payments from those customers or that Helinski failed to forward the payments to him. Most receipts lack a name of the customer. Richter indicated that he needed to shut down A-1's website to the loss of $44,421 because of the fraud of Allie Helinski, but he did not explain why he could not sell as much semen by other means, including continuing with the website and stating Helinski no longer worked for the business. He did not identify any lost sales or customers. We recognize that Jens Richter prepared his declaration in support of his motion for a default judgment when the facts were not in dispute, but he could have prepared an additional declaration in opposition to the motion to vacate in order to supply important facts controverting Allie Helinski's declaration.

In her declaration in support of the motion to vacate, Allie Helinski averred that the loss of the semen in the cryo-storage tank was not her fault because the tank failed. She also denied that she pocketed any money from sales on behalf of either A-1 or Global.

15

Jens Richter argues that Allie Helinski's declaration only refers to the conversion of the semen inventory and not to the other claims including the fraudulent sales, receipt of money from unauthorized sales, and fault for causing the tank to fail. As already stated, Helinski's declaration denied pocketing any of Richter's money. Richter may contend that the $295,550 in lost inventory is inventory that was never in the failed cryo-storage tank, but, if he does, the facts are confusing and we must take the facts in the light favorable to Helinski. Richter provided no evidence that Helinski was responsible for the failure of the cryo-storage tank.

Jens Richter criticizes the evidence presented by Allie Helinski as arising from a self-serving affidavit. We know of no rule that bars introduction of self-serving testimony in support of a motion to vacate a default judgment, let alone in support of one's position in any proceedings. Jens Richter's controverting evidence is equally self-serving.

### Mistake, Inadvertence, Surprise or Excusable Neglect

On the one hand, Jens Richter asserts that the trial court never found that Robert Sargent's failure to appear, answer, or otherwise defend the lawsuit was the result of mistake, inadvertence, surprise, or excusable neglect. Richter further argues that the trial court affirmatively found to the contrary. On the other hand, Allie Helinski contends that the trial court found evidence of mistake, inadvertence, surprise, and excusable neglect because the court commented that Helinski took all proper steps.

16

Both parties are partly correct. The trial court ruled that, assuming we look only to the behavior of Robert Sargent, Allie Helinski did not show mistake, inadvertence, surprise or excusable neglect. Although the trial court did not expressly state that, if we look only to the conduct of Allie Helinski, mistake, inadvertence, surprise or excusable neglect would be present, the court's ruling inevitably leads to this conclusion and the undisputed facts support such a conclusion. On being served with lawsuit papers, Helinski quickly contacted an attorney. She paid the attorney a retainer. When she received another letter from Jens Richter's counsel, she promptly contacted the same attorney. She also quickly contacted the attorney when Richter garnished her husband's account. Jens Richter does not contend that Helinski failed to act promptly or properly.

Jens Richter argues that Robert Sargent, as the representative of Allie Helinski, failed to timely appear without excuse and a party may not escape liability simply by arguing they hired a lawyer. Richter relies on many Washington decisions when a corporate defendant, through a failure of internal procedures, failed to timely appear and answer. Richter fails to recognize that his defendant, Allie Helinski, is without blame.

Many recent Washington decisions address negligence of an insurance company that led to a failure of an attorney to appear on behalf of the insured defendant. In this context when reviewing a motion to vacate a default judgment, Washington courts focus on whether the defendant, not the insurer, acted with excusable neglect. *Sellers v. Longview Orthopedic Associates, PLLC*, 11 Wn. App. 2d at 522 (2019). An insurer's

17

culpable neglect should not be imputed to a blameless defendant. *White v. Holm*, 73 Wn.2d 348, 354 (1968); *VanderStoep v. Guthrie*, 200 Wn. App. 507, 528, 402 P.3d 883 (2017); *Sellers v. Longview Orthopedic Associates, PLLC*, 11 Wn. App. 2d at 522. When a defendant properly notifies its insurer that a complaint has been served and the insurer fails to arrange for a timely appearance or answer without a legitimate excuse, the insurer's inexcusable neglect should not be imputed to the blameless defendant, except when the insured defendant fails to follow up with the insurer or fails to cooperate with the insurer. *VanderStoep v. Guthrie*, 200 Wn. App. at 530-32.

We note that, as a general rule, the sins of the lawyer are visited on the client. *Rivers v. Washington State Conference of Mason Contractors*, 145 Wn.2d 674, 679, 41 P.3d 1175 (2002). But this general rule contradicts the principle that default judgment is disfavored and conflicts with the goal of trying cases on the merits and doing what is just and proper under the circumstances of each case. *Ha v. Signal Electric, Inc.*, 182 Wn. App. 436, 452-53 (2014). Therefore, we discern no reason to differentiate between a blameless defendant receiving relief from the inexcusable neglect of her insurance company and a faultless defendant getting relief from the inexcusable inadvertence of her attorney.

One Washington Supreme Court decision supports a conclusion that the defendant should not be punished for the inexcusable neglect of her attorney. In *Agriculture & Live Stock Credit Corp. v. McKenzie*, 157 Wash. 597 (1930), Augusta Kalanquin was served

18

with an amended complaint in a livestock mortgage foreclosure suit and promptly submitted the pleading to her attorney, Husted. Husted departed the state and left an agister lien with attorney Richards, who Kalanquin eventually hired. Husted failed to inform Richards of the mortgage foreclosure or deliver Richards the foreclosure suit papers. Before Husted delivered the lien to Roberts, Kalanquin suffered an order of default and decree of foreclosure of her lien. The Supreme Court later affirmed the trial court's vacation of the order and decree on the ground of excusable neglect on the part of Kalanquin. Kalanquin relied on her attorney, and, through no fault of her own, the attorney departed Washington State. When Roberts later discovered the entry of the default, Roberts swiftly moved to vacate.

In *VanderStoep v. Guthrie*, 200 Wn. App. 507 (2017), the plaintiffs obtained a default judgment against the insured defendant because of the inexcusable neglect of the insurer. On appeal, the plaintiffs argued that, if the default judgment stands, the insurer, not the insured defendant, will have to pay the full judgment. Therefore, the insured suffers no harm and instead justice is served against the neglectful insurer. This court rejected the argument because in the meantime a large judgment remained against the insureds and because no case law supported the proposition that the identity of the payee of a default judgment is relevant to the second *White* factor.

One might argue that Allie Helinski suffers no harm by the pending default judgment, because Robert Sargent's malpractice carrier will eventually pay the judgment.

19

But, in the meantime, Helinski is subject to a large judgment and any malpractice suit may be fraught with delays and pitfalls.

## CONCLUSION

Justice is not served with hurried defaults. *Showalter v. Wild Oats*, 124 Wn. App. 506, 510-11, 101 P.3d 867 (2004). The trial court did not abuse its discretion when vacating the default orders and default judgment against Allie and Brent Helinski.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Fearing, J.

WE CONCUR:

_____
Lawrence-Berrey, J.

_____
Pennell, C.J.